**Case No. 24-4**

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

_____

**IN RE: FREDDIE OWENS,**

*Movant.*

_____

**CAPITAL CASE**

***EXECUTION SCHEDULED: TODAY 6:00pm, SEPTEMBER 20, 2024***

_____

**RESPONSE IN OPPOSITION TO MOTION TO FILE A SUCCESSIVE MOTION PURSUANT TO 28 U.S.C. § 2254**

_____

Petitioner, Freddie Eugene Owens, is a South Carolina death-sentenced inmate. His execution is scheduled for today. It is to begin at 6:00 pm.

Owens has filed an application for a successive 28 U.S.C. § 2254 action and an emergency motion for stay to pursue his action. Respondents oppose the application for authorization of a successive action and submit that Owens cannot meet the restrictions of 28 U.S.C. § 2244(b)(1) and (2) to allow the successive litigation. Therefore, the application, and the stay based on a request to litigate the action, should be denied. In support of their position, Respondents would respectfully show the Court:

1

1. By his filing, Owens concedes permission to file is necessary prior to filing in the district court. Owens is attempting to challenge the same judgment from his prior 28 U.S.C. § 2254 action – his conviction for murder (1999 trial) and his death sentence (2006 resentencing; thus, the action is correctly considered successive. *See In re Wright*, 826 F.3d 774, 783 (4th Cir. 2016) ("The Supreme Court has held that the phrase 'second or successive' 'must be interpreted with respect to the judgment challenged.'") (quoting *Magwood v. Patterson*, 561 U.S. 320, 333 (2010)). Therefore, Owens must show he falls under on the narrow exceptions in 28 U.S.C. § 2244 to this court to allow a second action.

2. Section 2244 provides, "A claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application shall be dismissed," unless:

> (A) the applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
> (B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; **and**
>
> (ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2244(b)(2)(A), (B)(i) & (ii) (emphasis added).

3. Owens argues he should be allowed to rely on (B). He presents two affidavits from co-defendant Golden, one dated August 22, 2024, and another dated September 18, 2024. In the August affidavit, he asserts that had "a verbal agreement" for a lesser sentence that "verbal agreement" was not revealed in his testimony against Owens. Golden also asserts in that affidavit that "[t]he prosecutor told" Golden not to acknowledge the deal. In the September affidavit, Golden asserts for the first time that Owens was not in the Speedway convenience store when Ms. Graves, the store clerk, was shot, though he had previously identified Owens as the shooter. Owens can meet neither Section 2244 (b)(2) requirement to allow the action.

4. As to (b)(2)(B)(i), Owens attempted to raise the claim of an undisclosed deal in a successive post-conviction relief action filed on August 30, 2024. He then requested a stay of execution from the Supreme Court of South Carolina. In an order filed on September 12, 2024, the Supreme Court of South Carolina considered Owens's argument that the new Golden affidavit and an unsigned draft affidavit from Golden's 1999 trial counsel simply did not support Owens's position or warrant new proceedings:

> We do not accept Owens' interpretation of the 1999 Draft Affidavit. Vieth, who prepared the 1999 Draft Affidavit for Golden to sign, stated unequivocally to the trial court during the *Brady* hearing that the document "had nothing to do with negotiations with the Solicitor's office whatsoever. Absolutely none." Rather, Vieth explained the document "was produced by me to try to convince a client to do what I thought was in his best interest and that

3

>is all that document is. Anything trying to intimate it means anything else would be totally erroneous." Vieth reiterated to the trial court "that there had been negotiations with the Solicitor's office that offered no guarantees except that as the plea agreement indicated if he cooperated, testified truthfully[,] that the Solicitor would consider leniency in this case."

(Attachment 1 at 3-4).

In other words, "the 1999 Draft Affidavit was not prepared to represent the plea negotiations between the Solicitor and Golden's attorneys but, rather, was evidence of what *Vieth* [*i.e.,* Golden's attorney], told Golden to advise him of the evidence against him and try to induce him to accept the signed plea agreement." (Attachment 1 at 4). Carefully read, the affidavit from Golden is consistent, reflecting "*my lawyers told me* the prosecutors offered me a deal. *They* said that if I testified that what I said about [Owens] in my written statement was true, the prosecutors would drop the death penalty and the possibility of life without parole." (Attachment 1 at 4). The Supreme Court of South Carolina concluded that Owens's "allegation that *the Solicitor* promised Golden sentencing leniency is not supported by either affidavit." (Attachment 1 at 4). Moreover, even if Owens's "interpretation" was considered, the state supreme court found a stay was not warranted for a successive PCR action because "Owens knew of the 1999 Draft Affidavit and Golden's admission that he was testifying to avoid the death penalty during his trial in February 1999. Therefore, his claim of a secret plea agreement cannot constitute

4

material evidence discovered within one year of the date of Owens' filing of his latest PCR application." (Attachment 1 at 4). In similar fashion, Owens fails to show the claims related to the alleged "verbal deal" were "previously unavailable" because the material not only existed, but it was also known to Owens. Owens cannot meet the criteria under 28 U.S.C. § 2244(b)(2)(B)(i).

As to the second affidavit and claim of "actual innocence," Owens has not identified a "claim" that is cognizable in § 2254 review. Though he contends that the "factual predicate" was not previously available, the statute requires that an applicant present the proposed claim that the "factual predicate" would support. If truly unavailable previously, as Owens contends, there could be no error from the trial, whether by the court or counsel or prosecution that could be presented. Further, the Supreme Court of the United States has never recognized "[c]laims of actual innocence based on newly discovered evidence … to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Herrera v. Collins*, 506 U.S. 390, 400 (1993).[1]

---

[1] Owens is incorrect to make a factual assertion of "actual innocence." More accurately, Owens hopes to undermine Golden's testimony from the 1999 trial, and argue the other evidence should not be believed, but the record of Owens's guilt, which includes his own admissions of guilt, rebuts his contention of "actual innocence." *See Herrera*, 506 U.S. at 398 ("In any system of criminal justice, 'innocence' or 'guilt' must be determined in some sort of a judicial proceeding. [Herrera]'s showing of innocence, and indeed his constitutional claim for relief

5

The Court in "assum[ing], the for the sake of argument in" *Herrera,* that "a capital case" in which "a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim," the standard would necessarily have to be firmly stringent:

> But because of the very disruptive effect that entertaining claims of actual innocence would have on the need for finality in capital cases, and the enormous burden that having to retry cases based on often stale evidence would place on the States, the threshold showing for such an assumed right would necessarily be extraordinarily high.

*Id*. at 417. As this Court has observed "the Supreme Court has never 'come across any prisoner who could make the "extraordinarily high" threshold showing[.]' " *United States v. MacDonald*, 911 F.3d 723, 798 (4th Cir. 2018) (citations omitted). Owens cannot do so here.

This Court has already reviewed the evidence from the 1999 trial and the 2006 resentencing,[2] and summarized the solid evidence guilt in the opinion denying relief in the prior § 2254 appeal:

> Golden (who had since pleaded guilty) testified to the events described above, including that Owens was the man

---

based upon that showing, must be evaluated in the light of the previous proceedings in this case, which have stretched over a span of 10 years."). In other words, asserting "actual innocence" here is asserting an argument (or more precisely, an intended argument) Owens wishes to make, not a fact.

[2]     Golden did not testify at the 2006 resentencing.

> in the ski mask who pulled the trigger. Vance also testified for the State, adding that Owens took credit for having "shot that bitch in the head" after hopping in Vance's getaway car. J.A. 1329. Owens's then-girlfriend testified that he had confessed to having shot the clerk to her, too. Owens also confessed to a detective and an investigator who had been assigned to the case and who likewise testified for the State. On this evidence, a jury returned a guilty verdict on all counts on February 15.

*Owens v. Stirling*, 967 F.3d 396, 404 (4th Cir. 2020).[3]  Additionally, though she "denied giving the statement," Owens's mother gave investigators "a written statement in which she asserted appellant admitted shooting the clerk." *State v. Owens*, 552 S.E.2d 745, 750 (S.C. 2001).

Here, to make an assertion of "actual innocence," Owens relied on an isolated instance of recanted testimony. Owens's initial hurdle is that " '[r]ecantation of testimony ordinarily is *unreliable* and should be subjected to the closest scrutiny when offered as ground for a new trial.' " *State v. Mayfield*, 235 S.C. 11, 35, 109 S.E.2d 716, 729 (1959) (quoting *State v. Whitener*, 228 S.C. 244, 89 S.E.2d 701 (1955)) (emphasis added).  Owens is also saddled with not just one instance of testimony against to undermine.  Golden has *consistently* affirmed that Owens was the shooter in multiple forums, including his own guilty plea. (Attachment 3,

---

[3]    The state court record was filed in the district court and is available in Case No. 0:16-cv-02512-TLW; the joint appendix was filed in this Court and is available in Docket No. 18-8; Owens also sought review by way of petition for writ of certiorari in the Supreme Court of the United States and those records are available in Docket No. 20-975.

7

November 11, 1997 confession; Attachment 4, 1999 guilty plea; Attachment 5, 1999 suppression hearing testimony; Attachment 6, 1999 trial testimony; Attachment 7, 2003 re-sentencing testimony; Attachment 8, 2003 guilty plea).[4] Moreover, the record shows not only statements by Owens admitting guilt, but also forensic and other evidence supports the details in those statements.

As to the evidence, the pathologist testified that "Ms. Graves died as a result of a single gunshot wound to the head" and died almost instantly (JA 1201, 1204). The store video was played showing both men were armed, both weapons visible on the screen. (JA 1223, 1225). Owens's admissions to investigators (Officers Joe Wood and Ken Evett) was proof not only of Owens's identity at the scene, but also specifically, evidence of Owen's guilt, his malice, and his character:

> Q: We were at the point where you told Mr. Owens that what he was telling you was not adding up, or something to that effect?
>
> A: That's correct.
>
> Q: And did he say anything to you in response to that?
>
> A: He did.
>
> Q: What did he say?

---

[4] Golden filed a 28 U.S.C. 2254 action in 2008. The documents regarding his plea may be found in Case No. 9:08-cv-03469.

> A: He said "the only thing I'm here for is to eat, sleep, shit and piss. I don't give a shit. I was born to be in jail."

(JA 1240).

As noted above, during the guilt phase in 1999, the State presented Owens's mother's statement to law enforcement, after Owens had been arrested for murder of a store clerk off Laurens Road, that Owens had told her that "he had killed a lady." When Owens was asked by the officer if he was aware that Owens's mother "had indicated that she was going to turn him in," Owens responded "if my mom says anything, tell her I said adios, to kiss her ass too. She can kiss my ass too." (JA 1240). He added, "Tell Ian and the rest of them assholes to fuck themselves. If I to jail, I go to jail. I don't give a shit." (JA 1240-1241).

As Officer Wood was writing the information down, Owens:

> just continued on from that point and he said "people tend to think I have a sick and evil mind, but I have a very educated mind. I would like to take the blame for all of this, but I'm not going to take it all myself. I made my mark on Hall Street after I got out of jail selling lots of drugs. I made lots of money. Yeah, I want to be remembered as the one who killed the most people in Greenville. I'm a real menace."

(JA 1241).

When asked to describe Owen's "demeanor during this conversation," Officer Wood testified, "He was cocky. He had a don't-care attitude. He smiled a lot when he was saying this." (JA 1241). Officer Wood testified, that Owens was "one of two

9

people out of probably 25 years in homicide that I have interviewed that actually gave me cold chills." (JA 1241). When advised that this case may be a capital case, Owens "said 'I don't give a shit about that either.'" (JA 1242).

Owens's former girlfriend, Aish Austin, testified Owens said to her, "they went in the store and the lady didn't open up the safe, so he just shot her." (JA 1262). Owens stated "he went in and he kept asking her to open the safe. She kept throwing up her hands and said she couldn't open the safe, so he just said, 'I shot the bitch.'" (JA 1226). (*See also* JA 1266, referencing written statement, "he said they went in and took the money and the lady behind the counter started talking junk and got smart, so he shot her in the head.").[5]

The convenience store manager confirmed that Ms. Graves did not have the authority to open the safe. (JA 1277). She also testified that a total of $37.29 was not accounted for from the register. (JA 1277).

Owens's co-defendants Steven Golden and Nakeo Vance, who testified at the initial trial, did not testify at the 2006 resentencing. Vance was brought to court but refused to testify. His prior testimony, however, was read into the record and that confirmed Owens was in the ski mask, while Golden wore a stocking to obscure his face. (JA 1333). Further, his testimony related that Golden and Owens ran back to

---

[5]  Ms. Graves's co-worker testified that Ms. Graves would occasionally "kind of tell them off" if people were "running their mouth" or "wanting to start some trouble…." (JA 1251-1252).

10

the car where Vance and Lester Young, another co-defendant in the spree of robberies the four embarked on, were. Owens asked if they heard the gunshot, and stated, "He shot that bitch in the head," while Golden complained that he did not get to shoot his gun. (JA 1329). Vance's testimony also reflected that Owens had explained that the victim "wasn't opening the safe, so he shot the whore" in Owens's words. (JA 1329-1340). Owens and Vance had switched guns so that Vance could use the gun that could be heard when pulling the hammer back since Vance would be in the more crowded robbery site and the sound "let everybody know it is a pistol." (JA 1326). Vance got rid of the gun Owens used to shoot Ms. Graves by throwing it from a bridge. He did so because Owens had admitted using the gun to shoot Ms. Graves. (JA 1335-1336). Before he threw it away, Vance checked and confirmed that a bullet had been shot leaving an empty shell in his gun where it had been fully loaded. (JA 1337).

The Solicitor argued Owens made "an intentional and willful choice to kill" Ms. Graves. (JA 1706). He argued Owens "made the intentional and calculated choice to kill and his punishment should reflect the degree and the magnitude of that choice." (JA 1706). The defense argued to disregard Owens's statements related by Ms. Owens and essentially all of the Vance testimony as to Owens being the shooter. (JA 1724-1725).

11

This shows, however, the two stark choices the arguments and evidence presented – either he was the shooter or disbelieve all the evidence (and his own admissions) and find Owens was not in the store. The jury's verdict was consistent with the first – the one the evidence supported – that Owens was the shooter. (*See also* Attachment 2, at 3, "Finally, it is not merely Golden's own testimony in two trials that his new affidavit squarely contradicts. Rather, as this Court, the United States District Court, and the United States Court of Appeals for the Fourth Circuit have repeatedly documented, the State presented considerable other evidence to the jury in Owens' 1999 criminal trial to support the facts that he was present for the Speedway robbery and fired the fatal shot killing Ms. Graves. This includes the evidence of Owens' five separate confessions-which certainly vary in terms of their inculpatory quality-to his girlfriend, his mother, Nakeo Vance, and two law enforcement officers.").[6] As to (B)(ii), again, Owens cannot make the requisite showing. Again, this Court must evaluate Owens's request "*in light of the evidence as a whole*, would be sufficient to establish *by clear and convincing evidence* that, but for constitutional error, *no reasonable factfinder would have found the applicant guilty* of the underlying offense." *Id.* As the Supreme Court of South Carolina found in considering (and rejecting) Owens's latest request to delay the execution "the State

---

[6] As the Supreme Court of South Carolina found, both would be major participants so that a death sentence could be imposed on both. (Attachment 1, at 9, citing *Tison v. Arizona,* 481 U.S. 137 (1987).

presented considerable other evidence to the jury in Owens' 1999 criminal trial" including his own confessions. (Attachment 2). Making such a showing an even more remote possibility, *if* Golden would eventually testify he will be confronted with his years and years of contrary statement, testimony and acknowledgments. Owens's reliance on this late obtain affidavit is far too little, far too late.

THEREFORE, based on the foregoing, this Court should deny the application.

                            Respectfully submitted,

                            ALAN WILSON
                            Attorney General

                            DONALD J. ZELENKA
                            Deputy Attorney General

                            MELODY J. BROWN
                            Senior Assistant Deputy Attorney General

                                Office of the Attorney General
                                Post Office Box 11549
                                Columbia, SC 29211
                                (803) 734-6305

                                *s/Melody J. Brown*
                    BY:_____

                      ATTORNEYS FOR STIRLING AND CANNING

September 20, 2024